FILED
SEP 2 3 2010
Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

EAGLE SUPPLY AND )
MANUFACTURING, L.P. )
)
Plaintiff, )
) Civil Action No.: 3:10-CV-407
v. )
)
BECHTEL JACOBS COMPANY, LLC. )
)
Defendant. )

## COMPLAINT

COMES NOW Plaintiff Eagle Supply and Manufacturing, L.P. (formerly known as Eagle Construction and Environmental Services, L.P. ("Eagle")) and files this Complaint against Defendant Bechtel Jacobs Company, LLC ("Bechtel"), and shows this Court the following:

### Jurisdiction

1. Plaintiff Eagle is a Texas corporation with its principal place of business in Eastland, Texas.

2. Defendant Bechtel is a Delaware corporation with its principal place of business at Highway 58, Blair Road, Oakridge, Tennessee 37830.

3. Bechtel, as contractor, entered into a subcontract agreement (the "Subcontract") with Eagle, a subcontractor, for Eagle to perform certain decontamination and demolition work on a project known as the K-1064 Peninsula and Laboratory Area Facilities Demolition Project (the "Project"). This action involves disputes arising out of that Subcontract.

4. The Subcontract's dispute resolution provisions provide, in part:

> **GC-4 Resolution of Disputes**
> The Parties agree to make good faith efforts to settle any dispute or claim that arises under this Subcontract through discussion and negotiation. If such efforts fail to result in a mutually agreeable resolution, the Parties shall consider the use of alternate dispute resolution (ADR) . . . In the event that ADR fails or is not used, the Parties agree that the appropriate forum for resolution shall be as follows:
> A. Subject to subparagraph 2 below, any litigation shall be brought and prosecuted exclusively in Federal District Court, with venue in the United States Federal District Court for the Eastern District of Tennessee, Northern Division.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship between Eagle and Bechtel and the amount in controversy exceeds the minimum jurisdictional limits of this Court. Bechtel is subject to the jurisdiction of this Court by reason of having transacted business in this State and within this District, including the business out of which this action arises.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Eagle's claims occurred in this District. In addition, the forum selection provision in the Subcontract, quoted above, stipulates that any action between the parties shall be brought in this District.

## Background

7. The Subcontract was awarded in connection with a broader contract between the United States Department of Energy and Bechtel concerning the closure of the East Tennessee Technology Park ("ETTP"), which produced enriched uranium for, among other applications, nuclear weapons.

8. In 2003, Bechtel issued Request for Proposal 23900-RFP-ET729 for the Project (the "RFP"), which called for the decontamination and demolition of several buildings within

2

US2008 1435206 7
687973.1

Case 3:10-cv-00407-TAV-CCS   Document 1   Filed 09/23/10   Page 2 of 13   PageID #: 2

two sections of the ETTP known as the K-1064 Peninsula Facility (the "K-1064 Facility") and the Laboratory Area Facility (the "Lab Facility", and, collectively with the K-1064 Facility, the "Facilities").

9. During the bidding phase of the Project, bidders, including Eagle, were not allowed sufficient time, or full access to several areas of the Facilities during pre-bid walk downs, to properly analyze the scope of work required by the RFP. Bechtel acknowledged that this lack of access inhibited the bidders' ability to establish accurately their bids and, thus, directed bidders to rely on certain bid-package documents in estimating and scheduling the work.

10. One such bid document, the Limited Characterization Report for the Lab Facility (the "LCR"), expressly provides that it "will provide prospective bidders the location, type, and level of contamination for responding to the request for the proposals for the Laboratory Area Facilities demolition", and that the "information provided in this report will be used by prospective bidders during the bid phase for developing their technical approach and associated cost estimates.

11. Bechtel also acknowledged that Eagle's limited pre-bid access to the Facilities prevented it from undertaking comprehensive surveys of the waste materials to be removed and that Eagle's walk downs were so brief as to prevent it from making independent assessments of waste volumes.

12. Accordingly, Eagle was required to base the waste removal portions of its bid on the Waste Generation Forecasts ("WGFs") that Bechtel performed for both Facilities and included in the RFP bid package.

13. Ultimately, Eagle submitted a proposal for the Project and was awarded the Subcontract, which was executed by the parties in or about February 2004.

3

14. The Subcontract provided for, among other things, payment of additional compensation to Eagle, in the form of an equitable adjustment to the Subcontract price, for additional work performed and costs incurred as a result of, among other things, changes to the work ordered by Bechtel and/or differing site conditions.

15. During the Project, Eagle performed additional work, and incurred additional hard and soft costs, arising from (i) substantial changes ordered by Bechtel, and the discovery of material differing site conditions, at the K-1004-L building in the Laboratory Facility; (ii) Bechtel's gross underestimation of the amount of waste materials required to be removed from both Facilities.

16. Notwithstanding that Eagle has submitted Requests for Equitable Adjustments ("REAs") for such additional work performed, costs incurred, and time lost, and provided all additional information Bechtel requested to further substantiate its REAs, Bechtel has failed and refused compensate Eagle in accordance with the terms of the Subcontract.

### The Combined Changes REA

17. An addendum to the LCR set forth the information upon which bidders, including Eagle, were instructed to base their bids for the portion of the work relating to a building known as K-1004-L. Bechtel's post-Subcontract changes to the scope of work required to decontaminate and demolish K-1004-L, as well as the discovery of material differing site conditions thereat, resulted in substantial cost and schedule impacts.

18. One such substantial change arose out of Bechtel's Change Order No. 2, which elevated the security classification of K-1004-L. This change raised the required security clearance level for the personnel Eagle could use to perform the work at K-1004-L. As a result, Eagle was unable to use its existing, budgeted workforce for any of the K-1004-L work and had to engage new subcontractors possessing such clearance, often at higher costs and with steeper

4

US2008 1435206.7
687973.1

learning curves, to perform the work. This change also materially delayed the start of the work at K-1004-L.

19. In addition, Eagle management personnel slated to supervise the work at K-1004-L were barred from entry because of the change in security classification, which directly impacted the cost and efficiency of the work as Eagle was forced to retain subcontractors with no background knowledge of the Project to fill key management roles.

20. Increased security measures required by the change in security classification also created lags in the availability of personnel, equipment, materials, and subcontractor resources and also caused packaging, loading and waste transportation delays.

21. In addition, the unpredictability of the changes and differing site conditions at K-1004-L prevented Eagle from accurately forecasting its need for union labor with sufficient security clearance. The lack of available security-cleared labor, and the inability to quickly adapt crew sizes for work to be performed the next day, or even the next week, compounded the delays in performing both in-scope and out-of-scope work.

22. Additional impacts arising out of Bechtel-ordered changes and differing site conditions at K-1004-L include, without limitation:

- discovery of substantially more asbestos than estimated in the LCR, which required additional abatement work;

- constantly expanding scope of K-1004-L materials reclassified for delivery to Nevada Test Site, thereby requiring additional removal and staging work, double-handling of waste, and inefficiencies and space limitations on site; and

- delayed receipt of security plans resulting in impacts to scheduling and coordination of work.

23. The magnitude of changes created a compounding effect that prevented Eagle from isolating impacts associated with each individual change or newly-encountered site condition.

24. On or about November 16, 2006, Eagle submitted to Bechtel, in accordance with the terms of the Subcontract, a Request for Equitable Adjustment with respect to the extra work and additional costs and delays it incurred in performing the work at the K-1004-L building (the "Combined Changes REA"), which included a request for $9,790,977.22 in additional compensation and a 240 calendar day extension of the Subcontract completion date.

25. Thereafter, Eagle and Bechtel engaged in mediation, which was successful in resolving a portion of Eagle's Combined Changes REA. Specifically, the parties settled the claim of a major Eagle sub-subcontractor, LVI, that was included as part of Eagle's initial Combined Changes REA. To account for the amounts no longer claimed post-mediation, Eagle, on or about March 14, 2008, submitted an adjusted Combined Changes REA seeking $4,835,642.62 in additional compensation. Eagle maintained its initial claim for a 240 calendar day extension of the Subcontract completion date.

26. To date, however, Bechtel has failed and refused to compensate Eagle in accordance with the Combined Changes REA or grant the appropriate extension of time.

### The Waste Generation REA

27. As noted above, Eagle was required to base the waste removal portions of its bid on the WGFs that Bechtel developed for the Facilities and included in the RFP bid package.

28. The WGFs forecasted 19,004 cubic feet (1,018.11 cubic yards) of waste-in-place at the K-1064 Facility and 559,282.05 cubic feet (20,714.15 cubic yards) of waste-in-place at the Lab Facility. To accurately compare the projected volumes of in-place waste (reflected in the WGFs) and the actual remediation quantities Eagle recorded while performing the relevant work,

6

Eagle used a conservative 15% expansion factor to convert the above in-place WGF quantities into remediation or "truck" cubic yards. The expanded (post-remediation) WGFs are 1,170.83 cubic yards at the K-1064 Facility and 23,821.27 cubic yards at the Lab Facility.

29.    Bechtel, however, grossly underestimated the amount of waste required to be loaded, transported and disposed of at both Facilities. Indeed, during Bechtel-mandated work control process training sessions, Bechtel addressed some of its past failures in a written hand-out, which included, among other things, its failure to calculate quantities properly.

30.    At the K-1064 Facility, the actual waste loaded, transported and disposed of by Eagle exceeded the amounts forecasted in the relevant WGF by 80,218 cubic feet (2,971.02 cubic yards).

31.    At the Lab Facility, the actual waste loaded, transported and disposed of by Eagle exceeded the amounts forecasted in the relevant WGF by 482,257.53 cubic feet (17,861.39 cubic yards).

32.    Eagle has incurred substantial additional hard and soft costs in performing this greatly-expanded scope of waste removal work.

33.    On or about December 3, 2007, Eagle submitted to Bechtel, in accordance with the terms of the Subcontract, a Request for Equitable Adjustment with respect to the additional waste-removal work it performed (the "Waste Generation REA"), which included a request for $2,054,676.37 in additional compensation and a 23 calendar day extension of the Subcontract completion date.

34.    On or about March 17, 2008, Eagle submitted an adjusted Waste Generation REA to reflect certain discussions and understandings reached between the parties during mediation.

7

This resulted in a $240,081.06 downward adjustment in the total Waste Generation REA to $1,814,595.31.

35. To date, however, Bechtel has failed and refused to compensate Eagle in accordance with the Waste Removal REA or grant the appropriate extension of time.

### Additional Unpaid Compensation and Withheld Retainage

36. Eagle has incurred additional costs and delays for which Bechtel is obligated to compensate Eagle, including the following:

- Change Order Nos. 22 and 29, rev. 1, for a total of $144,397.51, reflecting the revised Subcontract amount due for certain reduced-scope work resulting from these deductive change orders;

- Change Order No. 24 for $199,943.59 in additional compensation and a 15.4 day extension of the Subcontract completion date arising out of Bechtel's implementation during the Project of revised mandatory procedures BJC-FS-1001, Rev. 6 (Work Control), BJC-WM-2001, Rev. 3 (Generator Requirements for Transferring Waste), and BJC-FS-1041; and

- $293,724.55 in additional costs for contaminated equipment incurred by Eagle sub-subcontractor Combined Technologies, Inc. (collectively, with Change Order Nos. 22, 24, and 29, rev. 1., the "Additional Unpaid Compensation").

37. To date, however, Bechtel has failed and refused to pay Eagle the Additional Unpaid Compensation or grant the appropriate extension of time.

38. Moreover, Eagle earned an additional $317,012.55 in Subcontract payments that Bechtel withheld as retainage (the "Withheld Retainage").

39. Notwithstanding Eagle's completion of the Subcontract work and satisfaction of its obligations under the Subcontract, Bechtel has failed and refused to pay Eagle the Withheld Retainage.

40. All conditions precedent to the bringing of this action have been performed and/or waived, satisfied, or otherwise excused.

8

US2008 1435206 7
687973.1

Case 3:10-cv-00407-TAV-CCS   Document 1   Filed 09/23/10   Page 8 of 13   PageID #: 8

## Count One
### (Breach of Contract: Combined Changes REA)

41. Eagle reasserts and incorporates by reference the allegations set forth in Paragraphs 1 through 40 above as if fully set forth herein.

42. The Subcontract is a binding agreement between Bechtel and Eagle.

43. Under the terms of the Subcontract, Bechtel is obligated to compensate Eagle for the additional work it performed, and the increased costs and time impacts it incurred, as a result of the changes and differing site conditions at K-1004-L, as set forth in the Combined Changes REA.

44. Bechtel has breached the Subcontract by failing and refusing to compensate Eagle in accordance with the Combined Changes REA.

45. As a result of Bechtel's breach, Eagle has been damaged in an amount to be proven at trial, but in no event less than $4,835,642.62, plus interest thereon.

46. All conditions precedent to Eagle's recovery have been performed and/or waived, satisfied, or otherwise excused.

## Count Two
### (Breach of Contract: Waste Generation REA)

47. Eagle reasserts and incorporates by reference the allegations set forth in Paragraphs 1 through 40 above as if fully set forth herein.

48. The Subcontract is a binding agreement between Bechtel and Eagle.

49. Under the terms of the Subcontract, Bechtel is obligated to compensate Eagle for performing the additional waste removal work at the Facilities, as set forth in the Waste Generation REA.

50. Bechtel has breached the Subcontract by failing and refusing to compensate Eagle in accordance with the Waste Generation REA.

9

51. As a result of Bechtel's breach, Eagle has been damaged in an amount to be proven at trial, but in no event less than $1,814,595.31, plus interest thereon.

52. All conditions precedent to Eagle's recovery have been performed and/or waived, satisfied, or otherwise excused.

## Count Three
### (Breach of Contract: Additional Unpaid Compensation and Withheld Retainage)

53. Eagle reasserts and incorporates by reference the allegations set forth in Paragraphs 1 through 40 above as if fully set forth herein.

54. The Subcontract is a binding agreement between Bechtel and Eagle.

55. Under the terms of the Subcontract, Bechtel is obligated to pay Eagle the Additional Unpaid Compensation and the Withheld Retainage.

56. Bechtel has breached the Subcontract by failing and refusing to pay Eagle the Additional Unpaid Compensation and the Withheld Retainage.

57. As a result of Bechtel's breach, Eagle has been damaged in an amount to be proven at trial, but in no event less than $955,078.20, plus interest thereon.

58. All conditions precedent to Eagle's recovery have been performed and/or waived, satisfied, or otherwise excused.

## Count Four
### (Quantum Meruit)

59. Eagle reasserts and incorporates by reference the allegations set forth in Paragraphs 1 through 40 above as if fully set forth herein.

60. At the request and direction of Bechtel, and with its knowledge and consent, Eagle supplied additional materials, equipment, and labor necessary to complete the Project with the full expectation of receiving reasonable and equitable compensation therefor.

61. Bechtel knew, accepted, and acquiesced in Eagle's provision of such additional materials, equipment, and labor to the Project, which inured to the benefit of and conferred substantial advantage upon Bechtel.

62. The reasonable value of the aforesaid additional materials, equipment, and labor provided by Eagle for the benefit of Bechtel, and for which Eagle has not received payment, is at least $7,605,316.13, plus interest thereon.

63. Eagle is therefore entitled to recover in *quantum meruit* from Bechtel for the reasonable value of the benefits conferred upon Bechtel for which Eagle has not received payment.

64. All conditions precedent to Eagle's recovery have been performed, waived, satisfied, or otherwise excused.

### Count Five
### (Unjust Enrichment)

65. Eagle reasserts and incorporates by reference the allegations set forth in Paragraphs 1 through 40 above as if fully set forth herein.

66. In the alternative, by refusing to compensate Eagle for the additional work it performed on the Project, Bechtel has been unjustly enriched.

67. Therefore, Eagle demands judgment in its favor for the value of the materials, equipment and labor provided by Eagle for the benefit of Bechtel, and for which Eagle has not received payment, plus interest thereon.

68. All conditions precedent to Eagle's recovery have been performed, waived, satisfied, or otherwise excused.

## Count Six
## (Violations of Tennessee Prompt Pay Act)

69. Eagle reasserts and incorporates by reference the allegations set forth in Paragraphs 1 through 40 above as if fully set forth herein.

70. Eagle has performed its obligations in accordance with the provisions of its written Subcontract with Bechtel and completed its work thereunder.

71. Accordingly, all retainage held by Bechtel is due and payable to Eagle, but Bechtel has failed and refused to pay Eagle the Withheld Retainage.

72. Bechtel's failure to pay Eagle the Withheld Retainage constitutes a violation of Section 66-34-104 of the Tennessee Prompt Pay Act of 1991, §§ 66-34-101, *et seq.* (the "Prompt Pay Act").

73. In addition, Eagle submitted requests for payment for work performed and Bechtel failed to make payment within thirty (30) days.

74. In accordance with the Prompt Pay Act, on October 3, 2008, Eagle gave Bechtel written notice of its intent to seek relief thereunder.

75. Bechtel's subsequent bad-faith refusal to pay Eagle within ten (10) days of receipt of the aforementioned written notice as required by the Prompt Pay Act, in knowing and/or reckless disregard for Eagle's contractual rights under the Subcontract, entitles Eagle to the recovery of interest and attorneys' fees.

WHEREFORE, Eagle respectfully requests that this Court enter judgment in its favor and against Bechtel:

(a) on Counts One, Two, Three and Four of this Complaint in an amount to be proven at trial, but in no event less than $7,605,316.13, plus interest thereon at the highest rate allowed by law and/or the Subcontract;

(b) on Count Five of this Complaint and grant equitable relief for the actual value of the additional materials, equipment and labor provided by Eagle, plus interest thereon at the highest rate allowed by law;

(c) on Count Six of this Complaint and award damages, interest and reasonable attorneys' fees in an amount to be determined at trial; and

(d) for such other and further relief as this Court deems just and proper.

### Demand for Trial by Jury

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Eagle hereby demands trial of this action by jury.

Respectfully submitted this 23rd day of September, 2010.

> WOOLF, McCLANE, BRIGHT
> ALLEN & CARPENTER, PLLC
>
> By: /s/
> J. Ford Little, BPR No. 013870
> J. Keith Coates, BPR No. 025839
> Post Office Box 900
> Knoxville, Tennessee 37901-0900
> Tel: (865) 215-1000
> Fax: (865) 215-1001
> flittle@wmbac.com
> kcoates@wmbac.com
>
> OF COUNSEL
>
> Brian G. Corgan
> Neal J. Sweeney
> Ian M. Goldrich
> KILPATRICK STOCKTON LLP
> 1100 Peachtree Street
> Suite 2800
> Atlanta, Georgia 30309-4530
> Tel: (404) 815-6500
> Fax: (404) 815-6555
> bcorgan@kilpatrickstockton.com
> nsweeney@kilpatrickstockton.com
> igoldrich@kilpatrickstockton.com