UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

EAGLE SUPPLY AND            )
MANUFACTURING, L.P.,        )
                           )
        Plaintiff,          )
                           )
v.                          )   No.: 3:10-CV-407-PLR-CCS
                           )
BECHTEL JACOBS COMPANY, LLC, )
                           )
        Defendant.          )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Eagle Supply and Manufacturing, L.P. (Eagle) brings this action against defendant Bechtel Jacobs Company (BJC), alleging breach of a subcontract for the decontamination, demolition, transportation and disposal of demolition debris of 40 facilities at the Department of Energy's (DOE) East Tennessee Technology Park (ETTP) located in Oak Ridge, Tennessee. Eagle seeks damages for breach of the subcontract and for attorney's fees and interest under the Tennessee Prompt Pay Act, or in the alternative, prejudgment interest under Tenn. Code Ann. §47-14-123. BJC has asserted no counterclaims, but seeks reimbursement for its attorney's fees under the Prompt Pay Act.

Eagle presents two claims for additional payments under the subcontract referred to as requests for equitable adjustment or REAs. The first claim, the Combined Changes REA, claims additional costs that Eagle alleges it incurred performing work outside the

subcontract scope of work for K-1004-L. Eagle's second claim is the Waste Generation REA for excess waste that Eagle was required to load, transport and dispose of on the project.

BJC has conceded liability on the Combined Changes REA, and the only question before the court is the appropriate price. As to the Waste Generation REA, BJC contends that Eagle did not exceed the sum of the Waste Generation Forecasts for the project; therefore, no additional payment is owed to Eagle.

A five-day bench trial was conducted commencing on November 4, 2014. The parties subsequently submitted their proposed findings of fact and conclusions of law bringing the matter to issue in May 2015. Having heard the testimony at trial and having reviewed the record in this case, the following are the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

### I.  Request for Proposal

BJC held a prime contract with DOE to perform work required to shut down DOE's former Oak Ridge Gaseous Diffusion Plant located at the ETTP.  On November 17, 2003, BJC issued a Request for Proposal (RFP) to pre-qualified bidders inviting them to submit proposals for the subcontract to decontaminate and demolish a total of 40 facilities in two areas of the ETTP, 17 facilities in the Peninsula and 23 facilities in the Laboratory. [R. 166, PageID# 1712].  Changes to, or additional work performed outside the purview of the scope of work, entitled the winning bidder to additional compensation in the form of an equitable adjustment to the subcontract. [Ex. D-1].  There was an

2

inherent risk/benefit element to entering into the subcontract. The risk was a potential underbid – Eagle's bid price had to cover all of Eagle's costs, including the costs of performance, field overhead, and home office general and administrative expenses, as well as Eagle's profit for the subcontract's base scope of work. [R. 166, PageID# 1718]. If Eagle's price was too low, Eagle would be required to fund the shortfall from its own pocket. *Id.* Conversely, if efficient performance allowed Eagle to complete the subcontract work below its fixed price, Eagle would enjoy the benefit of a larger profit. *Id.*

On December 3, 2003, BJC conducted a pre-proposal conference for prospective bidders for the project. [R. 166, PageID# 1715]. Marc Walraven, Eagle's Vice President, participated in the conference. [R. 166, PageID# 1716]. During the conference, BJC noted that the K-1004-L building required a security clearance to access. K-1004-L housed classified chemical and radiological equipment and materials. However, BJC stated at the pre-bid conference that it was removing the equipment and materials, and that K-1004-L would be downgraded to uncleared access prior to mobilization. [R. 166, PageID# 1718]. Bidders were instructed by BJC to submit proposals as if K-1004-L was accessible to uncleared personnel. [Ex. P-4].

The conference also included site tours of the Peninsula and the Laboratory. However, access to the facilities during the tours was limited. Security clearance and contamination issues prevented bidders from entering all of the facilities at the Peninsula and limited access to the Laboratory facilities. [R. 166, PageID# 1723]. To enable bidders to understand and price the scope of work required by the RFP, two Limited

3

Characterization Reports (LCRs) were provided, one for the Peninsula and one for the Laboratory. The LCRs provided data about size, contents and contaminants to assist bidders in pricing their bids. [R. 166, PageID# 1752].

Additionally, BJC detailed the type and volume of waste that bidders were expected to dispose of on the project in two Waste Generation Forecasts included in the RFP. The forecasts specified individual waste volumes by solid and liquid material types (*e.g.* asbestos, wood, concrete, metal, equipment, roofing, solvents, decontamination solutions), waste types (*e.g.* low level waste, toxic substances), and even specified the disposal locations and the percentages of each material type forecasted to be disposed of. [Ex. P-1, P-2]. The Waste Generation Forecasts allowed bidders to establish pricing for waste minimization, loading, transportation and disposal requirements in the RFP. [R. 166, PageID# 1724].

Eagle submitted its bid for the project on January 5, 2004, at a price of $11,327,020. [Ex. P-10]. Eagle was not the lowest bidder for the project. The lowest bidder was LVI, which bid $9,893,307. [R. 166, PageID# 1730]. Of the three proposals submitted, Eagle's price was the second lowest as well as being slightly higher than the Federal Government estimate (which did not include overhead and profit). [Ex. P-12]. Washington Group's proposal was the highest rated, but also quoted the highest total price. [R. 170, PageID# 2352]. However, price was not the sole determinative evaluation factor as the merits of the technical proposal were considered equally as important. [Ex. D-1]. Eagle's technical proposal was scored significantly higher than LVI's technical proposal and Eagle's higher technical rating was the basis for BJC paying a price

4

premium above LVI for Eagle's work. [R. 170, PageID# 2358-59]. In addition, Eagle was a federally-certified small business and a Historically Underutilized Business Zone contractor, and BJC told Eagle that it would be advantageous to BJC to award the subcontract to Eagle because of these certifications. [R. 166, PageID# 1711]. By January 14, 2004, BJC decided to award the project to Eagle, based on technical merit and price. [R. 170, PageID# 2358].

Walraven was summoned to Oak Ridge by BJC to discuss Eagle's bid. At the meeting, Walraven was told that Eagle had to reduce its price by more than $400,000 or the subcontract would be awarded to LVI. [R. 166, PageID# 1734]. Faced with losing the subcontract, Eagle reduced its bid price by $444,383 to a price of $10,882,637 to secure the subcontract. BJC Operations Manager, Joe Williams, noted in an email that BJC "could have easily supported the competitively bid price but instead chose to negotiate with Eagle to achieve a lower price." [Ex. P-13]. Jay Snyder, BJC Project Manager, testified that he was uncomfortable with BJC's tactics that forced the price reduction by Eagle. According to Snyder, he and others were asked to leave the room and were not present when Williams insisted that Eagle reduce its price if Eagle wanted the subcontract [R. 170, PageID# 2395].

Eagle and BJC entered into the subcontract, with an effective date of January 27, 2004 and a completion date of November 4, 2005, for the price of $10,882,637 [Ex. J-1]. Eagle's bid price included all of Eagle's estimated costs of performance – the direct or hard costs of actually performing the project's base scope of work, and the indirect or soft costs of performance such as project site overhead and expenses, home office overhead

5

attributable to the project, general and administrative expenses. [R. 166, PageID# 1756]. Eagle also included in its bid price contingency dollars to offset the risk that Eagle either underbid the project or could not complete the base scope of work on budget. *Id.* Finally, Eagle included approximately 20% of its entire project budget as profit. (R. 166, PageID# 1767].

## II. K-1004-L Building

Almost immediately after mobilizing, Eagle encountered a differing site condition caused by out-of-scope sediment it was required to dispose of at the Peninsula facilities. [R. 167, PageID# 1909]. Eagle had to allocate nearly its entire workforce to the Peninsula and abandon its original strategy of working the Peninsula and Laboratory areas concurrently. *Id.* BJC paid Eagle additional compensation for performing the out-of-scope sediment work and awarded Eagle an extension of time totaling approximately 75 days. [R. 167, PageID# 1993].

During performance of the extra sediment work, BJC issued Change Order No. 2 which, rather than downgrading clearance at K-1004-L, upgraded clearance to require that every person entering the site possess at least DOE "L" clearance until the facility was fully decontaminated and ready to be demolished. [Ex. P-14]. Change Order No. 2 caused a change in how Eagle budgeted and planned to staff and perform work at K-1004-L. Eagle could not use its planned workforce, including most of its supervisory personnel, because they did not possess "L" clearance. The RFP had not required Eagle to supply an L-cleared workforce and Eagle's bid pricing was based on a budgeted workforce that did not include L-cleared workers. [R. 166, PageID# 1742]. Eagle could

6

not simply procure L-cleared workers mid-project to perform the work at K-1004-L. [R. 167, PageID# 1915]. L-cleared labor was in short supply because of competition from other projects ongoing at ETTP requiring cleared labor. [R. 167, PageID# 1912]. In addition, L-cleared workers' clearances were project specific. DOE and BJC procedures required Eagle to hire an L-cleared worker and then transfer the worker's clearance from a separate project to Eagle's project. [R. 167, PageID# 1915].

To meet schedule and manpower requirements, Eagle had to subcontract most of the work it planned to self-perform with its uncleared workforce at K-1004-L at a higher cost. [R. 166, PageID# 1742]. The additional security requirements imposed by Change Order No. 2 also resulted in a congested site and attendant efficiency impacts. [R. 168, PageID# 2032]. Change Order No. 2 required that a security fence encircle K-1004-L and all personnel seeking entry produce separate security credentials. Eagle was required to perform all K-1004-L work, including waste minimization and loading, within the secured area. *Id.* In addition, BJC delayed providing Eagle with a security plan for K-1004-L, which delayed Eagle commencing work at K-1004-L. [R. 167, PageID# 1918]. Eagle did not receive the Security Plan for K-1004-L from BJC until January 2005, nearly eight months after BJC issued Change Order No. 2. *Id.* Under Eagle's original project schedule, Eagle would commence work at K-1004-L on August 17, 2004, and complete work on August 4, 2005. Instead, Eagle could not perform any field work at K-1004-L until December 22, 2004, and did not begin in earnest until February 2005. [R. 167, PageID# 1914].

Upon beginning work at K-1004-L, Eagle experienced cost overruns and delays as Eagle encountered and remediated substantial amounts of out-of-scope asbestos and chemical and radiological contaminants, and dealt with BJC-imposed change orders and over 60 modifications to the subcontract's mandatory contractor procedures. [R. 167, PageID# 1919]. Abating the additional asbestos impacted Eagle's ability to coordinate and schedule other trades working simultaneously within the building. When additional asbestos was found, crews would have to be redirected and rescheduled until the asbestos was abated. [R. 167, PageID# 1920].

As a result of the heightened security requirements imposed by Change Order No, 2, Eagle subcontracted Laurie Dreyling to supervise the work inside the fence, around and inside the K-1004-L building. Dreyling was a project manager and project engineer with "L" clearance and extensive experience working at the ETTP. [R. 168, PageID# 2028]. Dreyling testified that when additional asbestos was encountered, the Eagle workers would have to step back and let the experts remove the asbestos before work could continue. [R. 168, PageID# 2037]. Jay Snyder, BJC Project Manager, testified that the discovery of out-of-scope asbestos at K-1004-L, particularly in the ceiling tiles, impacted the work by requiring additional personal protective gear for the crews working inside the building. [R. 170, PageID# 2363]. Eagle contracted with LVI for LVI to perform the asbestos removal services that Eagle originally planned to perform using its own labor [R. 167, PageID# 1884]. LVI ultimately submitted an REA totaling approximately $2.5 Million for out-of-scope asbestos abatement work at K-1004-L. [Ex. P-56].

8

In addition, BJC had represented that BJC would remove the classified equipment and materials inside the facility before mobilization; however, BJC did not complete the removal work prior to mobilization. [R. 170, PageID# 2386]. In particular, K-1004-L's process piping, which contained substantial quantities of classified chemical and radiological material, remained for Eagle to remediate. [R. 167, PageID# 1923]. Performing the out-of-scope removal of the process piping was made more difficult because the chemical and radiological waste could not be disposed of at the local project disposal sites. [R. 167, PageID# 1919]. Instead, Eagle had to separately identify, isolate, remove, stage, and package the classified waste for shipment to DOE's Nevada Test Site. [R. 167, PageID# 1923].

Next, Eagle discovered that the piping at K-1004-L contained substantially more fluorine gas than was specified in the RFP. [R. 167, PageID# 1919]. Eagle incurred additional subcontractor and material costs purging the out-of-scope fluorine. [Ex. J-54].

During the eight-month period from December 2005 through July 2006, BJC imposed over 60 revisions to the mandatory contractor procedures that impacted the work at K-1004-L. *Id.* The revisions covered nearly every aspect of how Eagle performed the K-1004-L work, including environmental health and safety requirements, emergency management procedures, equipment operation, maintenance and inspection procedures, hoisting and rigging procedures, personnel change procedures, and waste management procedures, among others. [Ex. J-1, J-54].

Brian Turner, Eagle's Project Manager, testified that BJC typically did not recognize modifications as changes to work; however, the modifications were not simply

9

alterations to paperwork, but rather changes to work procedures in the field that required extra time and cost to implement. [R. 167, PageID# 1921]. During performance of the work inside K-1004-L, Eagle dealt with five separate BJC mandated safety-related work stoppages, 16 BJC directed change orders, 39 separate differing site conditions, and 61 modifications to the mandatory contractor procedures. [Ex. J-54].

BJC took the position that the delays and increased costs Eagle incurred at K-1004-L were the result of Eagle's poor performance, rather than BJC's changes to the work or differing site conditions. [R. 170, PageID# 2369]. BJC argues that Eagle bears responsibility for 10% of the delays and cost overruns at K-1004-L due to Eagle's inefficiencies. However, Jay Frantz, BJC's Subcontract Technical Representative for the Eagle subcontract, testified that he did not observe any inefficiencies by Eagle in its performance of the K-1004-L work. [R. 168, PageID# 2114]. Frantz was responsible for managing the subcontract, ensuring that Eagle complied with all the technical requirements of the subcontract, and monitoring performance on-site every day. [R. 168, PageID# 2083]. Frantz praised Eagle's project management and field personnel for their performance overcoming countless unknowns and hazards. He noted Eagle did an excellent job in planning, scheduling resources, and communicating with personnel and BJC. He also noted that Eagle successfully passed a Nevada Test Site audit with no findings, which was rare. [Ex. P-58].

BJC attempted to present evidence that Eagle consistently failed to properly stage the equipment and materials required to perform the work on site, including fort lifts, shears, pallet jacks, and materials necessary to ship waste. [R. 168, PageID# 2102, 2115].

10

BJC offered two examples of equipment absent from the K-1004-L site, a shear attachment for Eagle's track hoe used to size reduce cement, metal and concrete construction debris, and a pallet jack used to load waste in disposal containers. However, Frantz testified that another Eagle track hoe was on site throughout the period that the shear was unavailable. [R. 168, PageID# 2106]. Moreover, a BJC witness testified that the K-1004-L building was not cleaned and ready for demolition until the end of June 2006, which is when the shear would be critical to Eagle's performance. [R. 168, PageID# 2119]. Thus, the shear's absence for a week or two in August/September 2005, when it was not needed, had no impact on Eagle's efficiency.

Frantz also testified that, according to Eagle's daily report for April 12, 2006, the absence of a pallet jack delayed Eagle in loading waste from K-1004-L into the ST-90 waste containers. [R. 168, PageID# 2102]. On cross-examination, however, Frantz reviewed Eagle's daily reports and acknowledged that Eagle was able to continue loading the ST-90 containers notwithstanding the absence of the pallet jack. [R. 168, PageID# 2108]. Based on the record, there is no credible evidence that the delays and increased costs Eagle incurred at K-1004-L were the result of Eagle's poor performance as alleged by BJC.

The record shows that Eagle continued to perform all the out-of-scope work at K-1004-L, and carry all of the additional resulting costs when BJC was unwilling to agree on pricing for the extra work. When Eagle objected to continuing performance of extra work without an agreement on price and a formal subcontract modification, BJC threatened Eagle with termination. [Ex. P-36]. It was not until April 2006, that BJC

11

agreed to pay Eagle on a time and materials basis until K-1004-L was fully remediated and ready for demolition. [Ex. P-49]. Eagle completed the work inside K-1004-L at the end of June 2006, and thereafter, the building was demolished. [R. 168, PageID# 2152].

### III.  Combined Changes REA

Due to the nature and scope of the changes to the work at K-1004-L caused by Change Order No. 2, Eagle submitted one REA, the Combined Changes REA, for the entire K-1004-L building on August 26, 2006. [Ex. P-54]. BJC has conceded liability for the Combined Changes REA, but disputes the amount owed to Eagle. [R. 166, PageID# 1801]. BJC argues that Eagle has failed to demonstrate a reasonable bid price and failed to provide complete and accurate data supporting Eagle's claimed actual costs for the decontamination and demolition of K-1004-L. Specifically, BJC argues Eagle did not track actual cost allocations using invoices, time cards, or other documents separate from its cost accounting system; Eagle did not keep time cards for its equipment identifying when and where the equipment was utilized; Eagle also did not keep actual records showing the assignment of manual and non-manual personnel work hours to each building; and Eagle did not keep actual contemporaneously generated records assigning material costs to specific buildings. [R. 167, PageID# 1980-81]. BJC's arguments are not supported by the record in this case.

Eagle calculated the Combined Changes REA using the "actual cost" approach because it preserved for Eagle its overhead, general and administrative expenses (G&A), contingency, and profit on the base scope of work for K-1004-L. [R. 166, PageID# 1766]. To properly price the Combined Changes REA, Eagle removed its internal

12

overhead, G&A, contingency and profit and compared the direct costs of performance Eagle budgeted to perform the base scope of work at K-1004-L against the direct costs of performance Eagle actually incurred completing the expanded out-of-scope work. The difference between Eagle's actual costs and Eagle's budgeted costs represents the additional costs Eagle incurred performing the out-of-scope work. Eagle then applied the relevant BJC multiplier to arrive at the price for the Combined Changes REA. *Id.*

Eagle's budgeted costs for K-1004-L were reflected in its bid estimate. Unfortunately, Eagle's chief estimator, Jay Pride, kept the estimate on his personal computer, and the estimate was lost when his hard drive crashed after execution of the subcontract. Pride later reconstructed the bid estimate so that Eagle could track its actual costs to the budget during the project. [R. 166, PageID# 1774]. Eagle's budgeted costs for the entire K-1004-L base scope of work totaled $1,764,816.86.

Scott LaBuy testified as Eagle's expert witness regarding the validity of Eagle's recreated budgeted costs. LaBuy had over twenty years of experience preparing cost estimates for nuclear facilities decommissioning projects at DOE sites, including ETTP. [R. 168, PageID# 2003]. LaBuy had prepared the bid estimate for LVI, who was the low bidder on the project. LaBuy used his contemporaneous cost estimate as a comparative tool to analyze the reasonableness of Eagles' budgeted costs for the same scope of work. [R. 168, PageID# 2005]. LVI's estimated costs for the K-1004-L base scope of work totaled $1,381,106, approximately $400,000 less than Eagle's budgeted costs of $1,764,817. [R. 168, PageID# 2006]. LaBuy then analyzed each component of Eagle's budgeted costs based on his industry experience and in comparison to LVI's estimated

13

costs for K-1004-L. He concluded that Eagle's reconstructed budgeted costs were reasonable based on his experience on similar decontamination and demolition projects at the ETTP. [R. 168, PageID# 2009]. LaBuy confirmed that Eagle's crew sizes were appropriate for the work at K-1004-L and that its pay rates were consistent with local prevailing wage rates in Oak Ridge at the time of the project. *Id.* The court finds LaBuy's testimony credible. Eagle's methodology for reconstructing Eagle's budgeted costs was appropriate and reasonable in light of the testimony at trial.

Eagle's estimating team isolated the budgeted costs specific to K-1004-L for purposes of calculating the Combined Changes REA. [R. 167, PageID# 1927]. Eagle relied on its project records to calculate its actual costs. Eagle supplied invoices from its subcontractors and suppliers together with computer spreadsheets of the hours and rates for persons working on the project. [R. 166, PageID# 1775]. Eagle's actual costs at K-1004-L as of August 28, 2006 totaled $6,143,072.24. [Ex. J-54]. This amount did not include three categories of costs incurred at K-1004-L. First, the out-of-scope asbestos abatement costs were not included because Eagle's subcontractor, LVI, had not yet submitted its REA. [R. 166, PageID# 1768]. Second, Eagle excluded all costs for loading, transporting and disposing of more waste than forecasted in the Waste Generation Forecasts because the overrun was a site-wide problem, rather than K-1004-L specific, and so Eagle claimed the costs in a separate REA. [R. 166, PageID# 1769]. Third, Eagle did not include the costs incurred after the time and materials period expired on June 26, 2006 because BJC told Eagle that Eagle would be paid for that work in accordance with the subcontract line items. [R. 166, PageID# 1770].

Eagle incurred cost overruns for (1) non-manual labor because of the extended duration and expanded scope of the K-1004-L work, (2) materials because the expanded scope of K-1004-L work required more and additional categories of materials such as personal protective gear and waste packaging materials, and (3) subcontractors because Change Order No. 2 required Eagle to subcontract an entirely new and unbudgeted "L" cleared workforce. [Ex. J-54]. After applying a credit for prior settled REAs, the total of the Combined Changes REA was $5,417,832.71. [R. 166, PageID# 1779; Ex. J-54].

On August 31, 2006, only three days after submission, BJC rejected the Combined Changes REA. BJC demanded that Eagle explain and quantify the duration and cost of each impact (*e.g.,* change order, differing site condition, mandatory contractor procedure modification) individually. BJC also alleged that the Combined Changes REA failed to take into account "poor planning or execution, or other factors under the control of Eagle or its subcontractors." [Ex. J-3]. By letter dated September 26, 2006, Eagle responded to BJC and included a revision of the Combined Changes REA that incorporated additional invoices received since the August 28, 2006 submission. [Ex. P-55].

In an October 18, 2006 letter, BJC agreed to use Eagle's modified total cost approach to calculate the Combined Changes REA. BJC also requested that Eagle revise and resubmit the Combined Changes REA to include all of the K-1004-L costs. [Ex. J-4]. On November 16, 2006, Eagle submitted a revision of the Combined Changes REA in accordance with the instructions BJC set forth in its October 18, 2006 letter. As BJC requested, Eagle added its budgeted costs for the K-1004-L demolition and site restoration work, which was not included in prior submissions because BJC previously

15

told Eagle that Eagle would be paid for that work in accordance with the subcontract line items. As a result, Eagle's budgeted costs for K-1004-L increased from $1,701,753.30 to $1,764,816.86 [Ex. P-55, P-56]. Based on the additional categories of costs that BJC requested be added to the Combined Changes REA, Eagle's actual costs increased from $6,131,774.80 to $9,899,254.51. *Id.* The increase resulted from Eagle's inclusion of LVI's approximately $2.5 Million REA for out-of-scope asbestos abatement work and Eagle's actual costs for performing the K-1004-L demolition and site restoration work. [R. 166, PageID# 1787]. The Combined Changes REA, as revised pursuant to BJC's directions, totaled $9,790,977.22 [Ex. P-56]. Simultaneous with its submission of the November 16, 2006 revised Combined Changes REA, Eagle delivered to BJC the additional backup documentation for the added actual costs. [R. 166, PageID# 1788].

In a January 7, 2007 email, BJC requested a detailed breakdown of Eagle's original proposal summary with "rates, quantities, indirects, profits, schedule and assumptions." [Ex. P-126]. On February 19, 2007, Eagle responded to each request with supplemental data. As requested, Eagle provided a detailed breakdown of Eagle's reconstructed budgeted costs and a copy of LVI's original pricing estimate and proposal letter to assist BJC in evaluating LVI's REA for out-of-scope asbestos work. Eagle also provided a report reflecting waste disposal volumes for the entire Laboratory area (not just K-1004-L). [Ex. P-57]. Eagle also offered to make its K-1004-L records available to BJC representatives for review at Eagle's offices, but BJC never took Eagle up on its offer. [R. 166, PageID# 1797-98]. Much of the information requested by BJC was either duplicative of the boxes of records Eagle already submitted to BJC earlier, or outside the

16

scope of the Combined Changes REA. [Ex. P-62]. Eagle provided support data including monthly project cost reports, detailed charge codes, payroll reports, certified payroll submissions, and LVI cost charges.

In May 2007, BJC advised Eagle that it was still evaluating the Combined Changes REA submitted in November. BJC's delay in evaluating the Combined Changes REA forced Eagle to bear the burden of millions of dollars in cost overruns. [R. 166, PageID# 1801]. Tom Burwinkle, Subcontract Administrator for BJC, wrote that BJC had "found the data received to date supports costs incurred by Eagle of $7.18 M." However, BJC did not specify which costs were supported and which costs lacked support. Instead, Burwinkle's letter stated that "Eagle has not proved cost and pricing data that supports approximately $2.71M of the requested REA value of $9.89M. Eagle is once again requested to submit data in support of its REA." [Ex. P-128]. Eagle replied that with the exception of BJC's request for Eagle, LVI and CTI equipment lists and CTI cost codes, BJC had not requested any additional K-1004-L related information or documents since January 2007. Eagle provided its own and LVI's equipment lists with its May 18 letter and noted that CTI's equipment list and cost codes would be provided upon receipt from CTI. Eagle also requested that BJC specify the costs it contended lacked supporting detail instead of simply challenging an aggregate amount of $2.71 Million [Ex. P-65].

In July 2007, BJC reneged on its earlier agreement to apply Eagle's pricing approach to calculate the Combined Changes REA. BJC instead proposed to take the total costs Eagle incurred performing all the work at K-1004-L, subtract all payments

17

Eagle received, and calculate a total cost overrun at K-1004-L of $4.6 Million. [Ex. P-130]. Walraven testified Eagle objected to this approach because it allowed no payment for Eagle's overhead, G&A, contingency and profit on the K-1004-L base scope of work and made Eagle pay for much of the out-of-scope performance costs for which BJC was responsible. [R. 166, PageID# 1807].

BJC also disregarded the supporting documentation Eagle submitted with the Combined Changes REA and proposed to reconstruct Eagle's actual costs using other documents. Burwinkle testified that BJC reconstructed the K-1004-L costs because Eagle failed to submit properly compiled and comprehensive supporting data. However, Burwinkle also testified that he never reviewed or analyzed the three boxes of data Eagle submitted to support the Combined Changes REA. [R. 168, PageID# 2163].

Eagle placed in evidence project records establishing its costs claimed in the Combined Changes REA. Eagle established its labor costs with payroll reports generated from Eagle's project accounting system. Eagle established its materials and subcontractor costs by submitting invoices for 22 separate subcontractors and 38 separate materials vendors representing over $4.2 Million in invoiced costs for K-1004-L. [Ex. P-94]. Eagle also submitted an equipment log recording the periods that Eagle's equipment was in use at K-1004-L. [Ex. D-481].

In the Fall of 2007, BJC proposed to mediate the parties' disputes. The mediation took place in November 2007, but failed to resolve any of Eagle's claims. Only LVI's claim for out-of-scope asbestos abatement work was settled.

18

On March 14, 2008, Eagle submitted another revision of the Combined Changes REA to account for the settlement of LVI's claim and to address points raised by BJC prior to and during mediation. [R. 166, PageID# 1811]. At the same time, Eagle was trying to collect payment for three smaller undisputed change orders and the over $200,000 balance of Eagle's retainage that BJC continued to withhold, even though Eagle completed the subcontract work over a year before. [R. 166, PageID# 1816].

BJC argues that because Eagle submitted nine versions of the Combined Changes REA, the court cannot credit Eagle's witnesses' testimony regarding the amounts due under the Combined Changes REA. BJC ignores the testimony and evidence that each time Eagle resubmitted an REA, the resubmission was in response to BJC's nitpicking with Eagle's methodology and supporting documentation. The court finds that Eagle, in good faith, attempted to respond to BJC's questions, only to have BJC submit more questions and more requests for documentation to avoid paying Eagle for the work Eagle performed on the project. The proof clearly established that on numerous occasions, BJC failed to even review the documentation provided by Eagle in support of its revised REAs. BJC continues nitpicking in its Proposed Findings of Fact and Conclusions of Law. Having reviewed the evidence and listened to the witnesses at trial, the court has not found BJC's witnesses or evidence credible to dispute the proof offered by Eagle.

## IV. Waste Generation REA

The subcontract included the transportation and disposal of the decontaminated and demolished facilities at the Laboratory and Peninsula. Eagle's scope of work encompassed 17 facilities at the Peninsula and 23 facilities at the Laboratory. Walraven

19

testified the volume of waste generated and removed from the project was substantially more than was represented in the RFP or observed from the pre-bid inspection. [R. 166, PageID# 1835].

Early in the project, Walraven testified Eagle was not required to record the quantity or "percentage full" of each container hauling project waste. During the course of Eagle's performance of the project, BJC imposed an additional requirement that Eagle record the percentage full of each container leaving the project. Eagle implemented BJC's requirement and began recording this data. [R. 166, PageID# 1842].

In calculating the total amount of waste disposed of on the project, Eagle used the percentage full data for every container when it was recorded. To determine the percentage full of the containers shipped prior to BJC's new procedure, Eagle used a weighted average calculation of the recorded percentage full values and applied that weighted average to the earlier loads. Through its review of the project records, Eagle determined that it exceeded each Waste Generation Forecast for the original scope of work for waste disposal. *Id.*

BJC presented testimony from Daniel Macias, a current UCOR[1] employee. BJC argues that the analysis prepared by Macias provides the best evidence of the amount for the Waste Generation REA. Macias testified that he reviewed Eagle's Waste Generation REA, conducted an independent analysis, and determined that Eagle disposed of more waste at the Peninsula, but less waste at the Laboratory, than in the Waste Generation

---

[1] UCOR succeeded BJC as the prime contractor at ETTP in 2011, and became responsible for resolving Eagle's claim against BJC.

Forecasts. In his opinion, the total amount of waste disposed of on the project did not exceed the sum of the combined Waste Generation Forecasts, and Eagle was not entitled to an equitable adjustment for waste exceedance. [R. 169, PageID# 2271]. The court gives little weight to Macias' testimony because his analysis relied on purported actual weights disposed of by Eagle when in fact he did not have actual weights for 75% of the Peninsula waste and 73% of the Laboratory waste. Macias also ignored the volumes recorded in Eagle's contemporaneous project shipping logs. [R. 169, PageID# 2269]. Even more incredible, Macias' analysis established that the Waste Generation Forecasts for the Peninsula underestimated the amount of waste by over 100%, yet he opined that the Waste Generation Forecasts were "very accurate." [R. 169, PageID# 2291].

Eagle requested compensation for the extra transportation and disposal costs when it submitted the Waste Generation REA on December 3, 2007. The Waste Generation REA consisted of a detailed narrative describing the method of determining the adjustment requested. It included detailed back-up information, including 65 pages of data containing the details of each loaded truck that left the project, affidavits from waste truck loaders and shippers, time charging records of Eagle employees, and invoices from Eagle subcontractors. [Ex. P-74, D-666]. Eagle is seeking $1,814,595.31 for the Waste Generation REA. [R. 166, PageID# 1857].

On March 17, 2008, Eagle revised the Waste Generation REA to address adjustments after the November 2007 mediation and to respond to BJC's question regarding the formatting of Eagle's payroll system. [R. 166, PageID# 1837]. BJC rejected the Waste Generation REA in its entirety.

21

BJC argues that Eagle did not provide BJC with timely notice that Eagle exceeded the Waste Generation Forecasts. However, the record shows that BJC had both actual and constructive notice that Eagle was disposing of substantially more waste than reported in the forecasts given the magnitude of out-of-scope work on the project generating waste. At BJC's direction, Eagle was required to load, transport and dispose of substantial additional quantities of sedimentary waste throughout the Peninsula area of the project. [R. 166, PageID# 1856]. BJC also directed Eagle, and Eagle directed LVI, to remove and dispose of substantial additional quantities of asbestos containing materials throughout the Laboratory area. [Ex. P-54]. BJC also had access to the actual waste data from the project disposal sites throughout the project. Eagle disposed of these additional waste quantities at the BJC-operated EMWMF (Environmental Waste Management Facility) and the Y-12 landfill. [R. 169, PageID# 2335]. It is not credible for BJC to claim that it was unaware of the differing site conditions relating to waste prior to receiving formal written notice from Eagle.

The court finds that Eagle has proven its costs as set out in the Waste Generation REA. Eagle demonstrated that it was impractical to track actual costs of waste transportation and removal. The proof at trial showed that Eagle's increased performance costs were solely attributed to the differing site conditions. [R. 166, PageID# 1842-57]. Accordingly, under the terms of the subcontract, Eagle is entitled to an equitable adjustment to recover the costs it incurred for performing the additional waste loading, transportation and disposal work on the project, plus overhead and profit. Eagle is entitled to an equitable adjustment of $1,814,595.31 for the Waste Generation REA.

22

## V.  CTI Contaminated Equipment Claim

Eagle included in its complaint a pass-through claim on behalf of its subcontractor CTI for the cost of certain contaminated CTI equipment.  In February 2012, Eagle learned that UCOR intended to settle the claim directly with CTI. [R. 168, PageID# 2063].  UCOR settled the claim for $100,000. [Ex. D-530].  Eagle then requested payment of its 13% markup on additional subcontractor costs, but the request was refused.  UCOR contended it purchased the contaminated equipment pursuant to a subcontract clause that did not provide for the payment of markups. [R. 168, PageID# 2143].

BJC contends Subcontract provision SC-12 provided that if equipment could not be adequately decontaminated, then Eagle would be compensated for the appraised value of the equipment considering age, condition and value of similar equipment.  The subcontract did not provide for the payment of profit and overhead on these amounts. [Ex. J-1].  Accordingly, the court finds that Eagle is not entitled to any amount for the CTI claim.

## VI.  Retainage Claim

Eagle also asserted a claim for payment of Change Order Nos. 22, 24 and 29, and the over $200,000 balance of Eagle's retainage that BJC continued to withhold. [R. 166, PageID# 1816-17].  At the end of 2012, UCOR contacted Eagle and offered to negotiate a resolution to these claims. [R. 168, PageID# 2077].  The claims were resolved for $512,139.20. [Ex. P-92].  The settlement agreement for retention reserved Eagle's right

to petition the court for interest on the retention amount pursuant to the Tennessee Prompt Pay Act. *Id.*

The parties engaged in mediation of these claims on three separate occasions. [R. 168, PageID# 2080-81]. Thereafter, UCOR and Eagle reached an agreement to settle all of Eagle's claims at mediation in March 2014. The settlement failed because DOE would not approve it. To secure audit protection down the road, UCOR chose to deny payment to Eagle. DOE recommended UCOR proceed to judicial determination of Eagle's claims. *Id.*

## VII. BJC's Acts of Bad Faith

The court finds that BJC failed to act in good faith in its dealings with Eagle on the project. During the bidding phase, BJC decided to award the subcontract to Eagle, but then withheld that decision from Eagle and instead told Eagle that it would not receive the subcontract unless Eagle reduced its bid price by almost $450,000. [Ex. P-12, 13].

Next, BJC transferred Eugene Glasbergen to ETTP with orders to reduce BJC's subcontractor costs by $100 Million. [Ex.P-88]. Glasbergen was assigned to the Eagle project because Eagle was submitting a significant number of REAs in connection with the K-1004-L building. *Id.* Glasbergen interfered with Eagle's management of the project by meeting and directing the work of Eagle's subcontractors without Eagle's permission or participation. [R. 167, PageID# 1941-43]. Glasbergen's interference so impacted Eagle's ability to manage its subcontractors that Eagle was compelled to send formal notices to BJC objecting to his conduct. [Ex. P-23, P-24, P-25]. Most disturbing

24

to the court is Glasbergen's report to the DOE Inspector General (IG) that Eagle overbilled for payment of previously negotiated, settled, and paid REAs, which led DOE to direct BJC to withhold all payments due to Eagle, including for the Combined Changes and Waste Generation REAs. [R. 166, PageID# 1817]. BJC even had Glasbergen lead the review team charged with investigating the allegations. [R. 169, PageID# 2173]. Contrary to BJC's assertions that Glasbergen was acting in good faith to assist Eagle on the project, the court questions Glasbergen's motive in light of evidence showing that Glasbergen's performance evaluation and related compensation were tied to the amount of money he saved BJC on the Combined Changes and Waste Generation REAs. [R. 169, PageID# 2216].

Next, in February 2006, when Eagle objected to continuing performance of extra work without an agreement on price and a subcontract modification on the K-1004-L building, BJC threatened Eagle with termination. [Ex. P-36]. Eagle could not continue to carry the costs of performance at K-1004-L without assurances under the subcontract that Eagle would receive payment. BJC later refused to pay Eagle for additional costs Eagle incurred performing the out-of-scope work at K-1004-L, even though BJC acknowledged a $4.6 Million cost overrun at K-1004-L. [Ex. P-130].

The court also finds that BJC's evaluation of the Combined Changes REA was riddled with bad faith. Burwinkle admitted at trial that he never reviewed the voluminous project documents Eagle submitted to support the Combined Changes REA. [R. 168, PageID# 2163; R. 169, PageID# 2182-83]. Then, Burwinkle admonished Eagle for failing to provide properly compiled and comprehensive supporting data. [Ex. P-128,

130].  Based on the evidence presented at trial, it is readily apparent that Eagle did not fairly evaluate Eagle's Combined Changes REA.

Finally, there was the BJC-initiated investigation by the DOE IG and Attorney General's Office of allegations that were the subject of settled REAs that had been negotiated extensively with Eagle.  Burwinkle testified that BJC was aware that Eagle and BJC fully negotiated the REAs before BJC closed and paid them.  Yet, BJC ignored these facts and cited many of the same issues the parties negotiated and resolved years before as evidence that Eagle committed fraud on the United States Government. [R. 169, PageID# 2201-02].   In investigating eight previous REAs (not the Combined Changes REA or Waste Generation REAs), Burwinkle and Glasbergen determined that $224,611 in claimed costs that were paid to Eagle were submitted fraudulently.  Defense Exhibit 270 sets forth the alleged categories of overbilling.  Burwinkle acknowledged that the amount paid for "Indirect Costs Paid Prior to Audit" was not an overbilling, but merely a "true-up" for indirect costs Eagle was paid prior to BJC completing the audit. *Id.*  BJC also alleged Eagle fraudulently overbilled for approximately $83,000 in employee time not supported by timecards. [Ex. D-270].  However, on cross-examination, Burwinkle admitted that BJC had project records, including certified payroll and daily reports, showing that the subject employees were working and paid on the days in question, but BJC failed to tell the DOE IG that BJC had other project records in its possession supporting many of the payments BJC claimed were fraudulent. [R. 169, PageID# 2245].

As a result of BJC's allegations, Eagle was required to respond to a grand jury subpoena, refute BJC's allegations to the Assistant United States Attorney, and defend

26

the unwarranted investigation. [R. 166, PageID# 1817]. The investigation resulted in no action against Eagle – no indictment, no plea agreement, no civil claims, no administrative actions, not even a backcharge from BJC, or request from DOE to return any funds. [R. 166, PageID# 1819]. This unwarranted investigation delayed Eagle's efforts to secure payment for the millions of dollars in extra work it performed on the project, including monies due to Eagle for which BJC never disputed entitlement.

## CONCLUSIONS OF LAW

This court has subject matter jurisdiction over this case because there is complete diversity of citizenship between Eagle and BJC, and the controversy exceeds the sum of $75,000 exclusive of interest and costs. 28 U.S.C. § 1332(a).

## I. BJC Breached the Subcontract

Under Tennessee law, the essential elements of any breach of contract are (1) the existence of an enforceable contract, (2) breach of the contract, and (3) damages which flow from the breach. *Life Care Cts. Of Amer. Inc. v. Charles Town Assocs Ltd P'ship*, 79 F.3d 496, 514 (6th Cir. 1996). Eagle and BJC entered into a written, enforceable subcontract. BJC breached the subcontract by failing and refusing to pay Eagle for services and materials Eagle supplied pursuant to the terms of the subcontract. Specifically, BJC was obligated but refused to pay Eagle for the work performed at K-1004-L, and for the loading, transportation and disposal of waste project-wide that was outside the subcontract's base scope-of-work.

Based on the Findings of Fact discussed above, the court finds that BJC breached the subcontract. Further, as a direct result of BJC's breach of the subcontract, Eagle

27

suffered damages in the amounts it was entitled to receive for the Combined Changes REA, and the Waste Generation REA.

A contractor seeking an equitable adjustment must prove three elements – liability, causation, and resultant injury. *Blinderman Const. Co. v. United States,* 29 Fed. Cl. 529, 538 (1997). Eagle bears the burden of showing entitlement to additional amounts for changes in scope or differing site conditions. *See Short Bros, PLC v. United States,* 65 Fed. Cl. 695, 775 (2005). The proper standard used in determining whether each element has been met is the "preponderance of the evidence" test. *Id.* The court finds Eagle has met its burden by proving that BJC's acts or omissions caused Eagle to incur increased costs in performing the subcontract. Thus, any increased costs flowing directly from BJC changes to Eagle's scope of work are compensable. *See Elec. & Missile Facilities Inc. v. United States,* 416 F.2d 1345, 1361 (Ct. Cl. 1969); *Paul Hardeman, Inc., v. United States,* 406 F.2d 1357, 1362 (Ct. Cl. 1969) (equitable adjustment is "the difference between what it cost [the contractor] to do the work, and what it would have cost [the contractor] if unforeseen conditions had not been encountered"). The object in an equitable adjustment "is to leave the parties in the same position costwise and profitwise as they would have occupied had there been no change, preserving to each as nearly as possible the advantages and disadvantages of their bargain." *Massman Constr. Co.* ENG BCA No. 3660, 81-1 BCA ¶ 15049.

The subcontract's General Condition GC-20 sets forth the mechanism for Eagle to receive an equitable adjustment to the subcontract price or schedule for impacts beyond its control or work performed outside the subcontract scope-of-work. The subcontract

28

also contains a Changes Clause, General Condition GC-18, whereby the parties may amend the subcontract pursuant to a subcontract modification as initiated by an Eagle-submitted REA. Throughout the project, the parties amended the subcontract price and schedule pursuant to subcontract modifications initiated by Eagle-submitted REAs.

Eagle's Combined Changes REA and the Waste Generation REA are properly requested adjustments to the subcontract resulting from changes to, or performance of work outside the scope-of-work that caused cost and schedule impacts for which BJC was responsible. BJC has conceded Eagle's entitlement to the Combined Changes REA and Eagle has demonstrated that it undertook all requisite measures to properly establish entitlement to the Waste Generation REA.

BJC seeks to avoid payment arguing that Eagle violated the Truth in Negotiations Act by failing to submit a signed Certificate of Current Cost or Pricing Data certifying that the data Eagle submitted in support of the Combined Changes and Waste Generation REAS was current, complete and accurate. However, the obligation to submit the certificate does not accrue until the parties agree on a price for the REAs. 48 C.F.R. § 15-406-2 (contractor certifies data is accurate, current, and complete as of "the day, month, and year when price negotiations were concluded and price agreement was reached"). The record shows that Eagle and BJC never reached a price agreement for either of the REAs. [R. 166, PageID# 1786].

## II. Eagle's Damages

Eagle need not prove its damages "with absolute certainty or mathematical exactitude." It is sufficient if it furnishes the court with a reasonable basis for

29

computation. *Delco Elec. Corp. v. United States,* 17 Cl. Ct. 302, 319-20 (1989). A determination of the amount of an equitable adjustment by a court is generally one of fact. *United States v. Callahan Walker Constr. Co.,* 317 United States 56. 61 (1942); *Kippers Co. v. United States,* 405 F.2d 554 (Ct. Cl. 1968). The purpose of an equitable adjustment is to compensate a contractor for the unanticipated and extra out-of-pocket expenses it incurred in performing the contract as a result of a change. *Coley Prop. Corp. v. United States,* 593 F.2d 380 (Ct. Cl. 1979). The project records entered into evidence at trial more than satisfy Eagle's burden – the records establish the accuracy of Eagle's pricing for every cost component in the Combined Changes REA, and the Waste Generation REA. [Ex. P-74, P-94, D-481, D-503-05, D-666].

For the Combined Changes REA, Eagle's non-manual and manual labor costs are reflected in payroll reports from Eagle's project accounting system that provide the number of hours each employee worked per day, the daily time spent working at K-1004-L, and the resulting labor costs. [Ex. P-94, P-136, P-137]. To establish its materials and subcontractor costs, Eagle submitted rolled-up cost summaries for each vendor or subcontractor that supplied materials or labor at K-1004-L and copies of invoices for every payment Eagle is claiming. [Ex. P-94]. Eagle's equipment costs are set forth in a log reflecting the types of equipment used at K-1004-L, the time periods during which it was used, and the resulting charges. [Ex. D-481].

For the Waste Generation REA, the record contains project backup for every cost Eagle incurred for loading, transporting and disposing of waste in excess of the amounts forecasted in the RFP's Waste Generation Forecasts. [Ex. P-74, D-503-05]. To support

Eagle's waste-related labor cost overrun, Eagle submitted payroll reports from its project accounting system reflecting the number of hours each employee worked on waste tasks per day from the date Eagle exceeded the Waste Generation Forecast at the Peninsula and the Laboratory until the waste disposal work was completed. [Ex. P-74, D-503]. The only exception is the Laboratory non-manual labor associated with waste disposal because those costs were included as part of the Combined Changes REA. [Ex. P-74].

Eagle used some of its own equipment for waste loading, transportation and disposal after exceeding the Waste Generation Forecast. To establish that equipment cost overrun, Eagle submitted equipment usage logs reflecting the types of equipment used for waste loading, transportation and disposal at the Peninsula and the Laboratory, the time periods during which the equipment was used and the resulting charges. *Id.* Subcontractors, rental equipment, and other small expenses made up the balance of Eagle's waste-related cost overrun. Eagle included within the text of its Waste Generation REA cost summaries for each subcontractor and vendor at the Peninsula and the Laboratory, and provided copies of invoices and expense reimbursement records for these waste-related costs. [Ex. D-503, D-666].

### III.  Tennessee Prompt Pay Act

The court has previously found that the Tennessee Prompt Act encompasses the subcontract signed by Eagle and BJC [R. 100]. Tennessee's Prompt Pay Act requires prime contractors pay subcontractors in full for all amounts earned within 30 days after the subcontractor submits its application for payment. *See* Tenn. Code Ann. § 66-34-302(a). The Act also requires the prime contractor to pay all retainage due to the

31

subcontractor within 10 days after the receipt of the retainage from the owner. Tenn. Code Ann. § 66-34-103(b). Any payment not made in accordance with the Act accrues interest from the date due until the date paid. Tenn. Code Ann. § 66-34-601. To seek relief under the Prompt Pay Act, the subcontractor must provide written notice to the prime contractor of its intent to pursue relief in accordance with the statute's notice provisions. Tenn. Code Ann. § 66-34-602(a)(1). If, within 10 days after receipt of notice, the prime contractor fails to provide adequate legal reason for its failure to make payments, the subcontractor, in addition to any legal remedies available at law or in equity, may sue for equitable relief. Tenn. Code Ann. § 66-34-602(a)(3). The provisions of the Prompt Pay Act may not be waived by contract and are applicable to all private contracts in Tennessee. Tenn. Code Ann. § 66-34-701.

BJC refused to pay Eagle for the Combined Changes REA, even though it has conceded entitlement, and refused to pay the Waste Generation REA. BJC also refused to pay Eagle the balance of its retainage until February 2013, at least five years after it was due. BJC's reason for failing to make these payments – that it had no obligation to do so unless and until DOE approved them and provided BJC with the funds to pay – contradicts the express language of the subcontract. Subcontract provision SC-15 sets forth BJC's bases for withholding payments from Eagle, but they do not include the right to withhold payment pending receipt of payments from DOE. Rather under SC-37, it is BJC's obligation to allocate sufficient funds to pay for all subcontract work from funds allocated to BJC, not DOE's obligation to allocate specific funds to the subcontract as a condition precedent to Eagle's right to payment. [Ex. J-1].

32

Section 601 of the Prompt Pay Act provides that interest shall be calculated at the same rate as interest on judgments in Tennessee as set forth in Tenn. Code Ann. § 47-14-21. *See* Tenn. Code Ann. § 66-34-601. The interest rate under § 47-14-121 was 10% until July 1, 2012, when the statute as amended to apply a new formula. *See* Tenn. Laws Pub. Ch. 1043 (H.D. 2982). The rate has remained set at 5.25% since July 1, 2012. *See* Tenn. Judgment Interest Rates, July 1, 2012-Jan. 1. 2015. The Tennessee Supreme Court has held that statutes affecting the construction, enforcement or discharge of a contract, like the Prompt Pay Act, that are effective at the making of the contract "form a part of [the contract] as fully as if they had been expressly referred to or incorporated in its terms." *Robbins v. Life ins. Co. of Va.*, 89 S.W.2d 340, 341 (Tenn. 1936); *see also Kee v. Shelter Ins.*, 852 S.W.2d 226, 228 (Tenn. 1993). Here, the parties entered into the subcontract in January 2004; Eagle completed its work in 2007; served its notice of intent to seek relief under the Prompt Pay Act in March 2008; and commenced this action in September 2010. Therefore, the court finds that Eagle is entitled to 10% interest under the Prompt Pay Act because the claims accrued prior to July 1, 2012.

Eagle has demonstrated that it is entitled to payment for additional work rendered pursuant to the subcontract for which BJC failed and refused to make payment, including the Combined Changes REA, and the Waste Generation REA. Eagle performed work in accordance with the terms and conditions of the subcontract. Eagle also established entitlement to payment of interest for the Settled Claims pursuant to the subcontract that BJC failed and refused to make timely payment thereon for nearly a decade. Eagle provided BJC with the requisite notice pursuant to Tenn. Code Ann. §§ 66-34-602(a)(1

33

and (a)(2). Thus, Eagle is entitled to an award of interest pursuant to Tenn. Code Ann. § 66-34-601 at the rate of 10% per annum. Interest under the Prompt Pay Act begins to accrue from the date the payment was due until the date paid. Tenn. Code Ann. § 66-34-601. Thus, Eagle is entitled to interest for each claim from the date payment was due (30 days from the date submitted to BJC) through the date of filing of Judgment at the rate of 10% per annum.

Eagle is also entitled to an award of attorney's fees pursuant to Tenn. Code Ann. § 66-34-602(b) because Eagle is the prevailing party in this action and BJC did not act in good faith, common fairness, or common equity, but acted with bad faith and reckless disregard for Eagle's rights under the subcontract.

## CONCLUSION

In light of the foregoing discussion, the court finds that Eagle is entitled to payment in full for the Combined Changes REA, the Waste Generation REA, and to an award of interest and attorney's fees under the Tennessee Prompt Pay Act. Specifically, Eagle shall recover the following damages and interest[2]:

| | |
|---|---|
| Combined Changes REA | $ 5,128,275.71 |
| Interest on Combined Changes REA | $ 4,205,737.66 |
| Waste Generation REA | $ 1,814,595.31 |
| Interest on Waste Generation REA | $ 1,250,328.74 |
| Interest on Settled Claims | $    293,541.88 |
| | |
| Total Damages | $12,692,479.30 |

---

[2] Total interest on each claim through March 6, 2015 is shown above and the respective per diem rates are as follows: Combined Changes REA – per diem $1,401.45; Waste Generation REA – per diem $497.15; Settled Claims – per diem $97.81.

Eagle shall submit its Application for Attorney's Fees and costs to the court within thirty (30) days of entry of judgment in this action.

A judgment consistent with these findings of fact and conclusions of law will be entered.

**IT IS SO ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**